Utah Wilderness v. Department of Interior. Thank you, Your Honors. May it please the Court, Stephen Block for Appellant Southern Utah Wilderness Alliance. I'm going to reserve three minutes of my time. The Bureau of Land Management violated the rule of reason when it rejected two middle ground reasonable alternatives proposed by SUA for an environmental assessment that was prepared to support an oil and gas lease sale in Utah for the November 2011 sale. One of these alternatives was to offer four of the parcels that were located in a cluster atop horse bench with no surface occupancy stipulations. Excuse me. Now, are you telling us what the district court did or what was done before the agency, BLM? So, Your Honor, I'm saying that SUA proposed these four alternatives to the Bureau of Land Management and it's... But your argument here is what the district court, how the district court erred and not before that? Well, Your Honor, the district... may have constituted was an error, that that does not show any harm that the agency did to you. I'm not sure if Your Honor is headed towards the waiver issue that the United States raised or if you're asking about... Well, this is an APA case. Yes. And so, we need an agency decision.  We're not fighting about what the district court may have done. Right. I see. So, here SUA has challenged the failure of the agency to follow the rule of reason in its alternatives analysis and this court, in multiple cases, has tackled that failure. In cases like Davis and Flowers and an Airport Neighbors Alliance, the court has squarely addressed the alternatives analysis in an environmental assessment and it's really a matter of remand as to what the remedy should be. So, here where SUA had a reasonable middle ground alternative, this no surface occupancy alternative for four of the parcels and the BLM failed or violated the rule of reason, that's what's squarely in front of this court and I'd like to focus my argument on the no surface occupancy stipulation alternative. Now, this court has set forth the rule of reason analysis to guide its review of the BLM's alternative analysis. Here BLM had considered the no action alternative, so not offering any parcels for lease, the proposed action to offer all nine parcels. It did not consider an outright rejected SUA's no surface occupancy alternative. The first part of the rule of reason analysis is that SUA's no surface occupancy alternative is significantly distinguishable from any prior analysis. So this is the first time at the lease sale stage that the Bureau of Land Management considered making the four horse bench parcels available for lease. Well, is the problem here that their first review of leasing was concerning a very broad area and they're saying, well, the things that you're now arguing about we considered when we looked at this very broad area for leasing. So that is a part of their argument. The BLM points to the price resource management plan and in that, that's a, the resource management plans look at resource allocation issues. There's no specific decision made in the RMPs whether or not to lease any tract of land. And the BLM in the price plan had an alternative, alternative E, which would have made 1.5 million acres closed entirely to new oil and gas leasing. Now that's not the plan they adopted obviously. And at no point in the price RMP did they consider a no surface occupancy alternative for the four parcels here or for the lands that were subject. Right, because they weren't that narrow at that point. They were looking more broadly. Well, how does the alternative E differ from what you're asking for now? So SUA's alternative I would submit as a reasonable middle ground alternative. It would allow the BLM to lease and for a lessee to fully extract the subsurface resources while preserving the surface. And so had BLM... How do you do that? Well, through directional drilling, your honor. Even that takes, well, okay, at an angle, come in from someplace else. Exactly. Okay. And so... But that's not very economically considered, is it? I mean, as far as the drilling is concerned, when you go straight down as versus when you're diagonally drilling, you don't know what kind of problems you're going to run into in drilling like that. Why have... I mean, that's not very reasonable. Well, I have a few responses there. So there's a report that the lessee here points to that's called the New Tech Engineering Study, and that's at appendix 154 and 175 and 176. This New Tech report was appended to the West Tavaputs Environmental Impact Statement. That was a step-down analysis from the price plan. But to your point, that report, we believe, supports the argument that the no-surface occupancy alternative SUA proposed is in fact a reasonable and technically feasible alternative. It's important though to note, SUA proposed this no-surface occupancy alternative, and the BLM acknowledged this much in 618 through 620 in the appendix. There's no response though to SUA's alternative. So BLM... So this court has no record to gauge whether or not SUA's alternative is economically feasible or not. Now, we think this New Tech... Counsel, let me... Okay. We're talking about, I think, 4,000 acres. Yes. That's correct. And you're talking about, by drilling sideways, you're leaving a whole lot of ground uncovered when you can drill vertical down to... That just kind of defies... You're leaving a whole lot of the 4,000 acres uncovered for potential recovery. And that's not reasonable, or it doesn't seem reasonable to me, let's put it that way, when by spacing, you can recover the maximum of the minerals that are being mined for at that. Am I not right? Well, so I have a few responses there. Firstly, is the formation that's being produced from here really doesn't start until about 4,800 to 5,000 feet. And what this New Tech report confirms is that the use of this technology throughout the West Tavaputs field is feasible, and is being used very actively. It's reasonable, but is it reasonable? That's the test that we have, is the reasonableness of being able to... Well, Your Honor... Go ahead. Well, so when you ask, is it reasonable, I think this Court's rule of reason analysis, when SUA proposes the no-surface occupancy alternative, and there is this New Tech report that says that it is a feasible alternative, is it reasonable in the sense that it would allow the agency to perform a cost and benefit analysis, and determine whether a sufficient amount of the subsurface could be developed, such as that it should be carried forward for further analysis? Now there's no answer here. SUA... And so this case is much more like, I think, Davis, where BLM... I'm sorry, in that case, where the Federal Highway Administration simply gave perfunctory conclusory treatment to an alternative that fit somewhere within the extreme. Here the purpose and need statement for this oil and gas sale was to make parcels available at the November 2011 lease sale. It didn't... And that is the statement that defines the reasonableness of the range of alternatives. And again, here we have the no-action alternative, make no leases available, the proposed action offer all nine, pursue it or put forward an alternative that is non-speculative, facially reasonable, that all nine parcels could be offered, but four of the nine simply wouldn't have surface disturbance authorized. And again, there's no answer here from BLM. So they don't say, no, it's not a reasonable alternative. And they don't say, no, it's not a technically feasible alternative. At 618 through 620 of the appendix is the response to comments in the final environmental assessment, and there's no answer from BLM. And that's not a reasonable response. When somebody... No, I'm just going to say, now, did you raise that argument before the...  We raised the no-surface occupancy alternative was a part of our comments to the BLM. And that's why at 618 through 620, you see BLM responding. So you see that they identified that we raised it, and then they don't have a response. And we did raise the BLM's failure to address the no-surface occupancy alternative in front of the district court for a variety of reasons. The court rejected our... Well, is it BLM's position, I guess we'll hear from them, but that when they considered alternative E, they were in effect also within that, considering the no-surface occupancy alternative. I do think that's their argument. And that's... Yeah, and you're just saying that's not good enough, because that's not narrowed to these four parcels. Well, that was looking, again... So the resource management plan is a resource allocation decision. It makes no specific decision whether or not a parcel should be offered for sale. And the BLM's own instruction memorandum, 2010-117, that's at Appendix 5-24, says exactly that point, that an RMP does not mandate that any particular tract of land should be offered for sale. And the price RMP, when it looked at whether or not to make 1.5 million acres available for leasing or not, so should it be closed for leasing, that is not the same as saying should less than 4,000 acres be available for leasing, albeit with no-surface occupancy stipulations. The final point I'd like to make here before I sit down is that for SUA's alternative to be reasonable, it has to fit within the agency's statutory mandate. And here that mandate is the Federal Land Policy and Management Act of FLTMA. And FLTMA is quite sweeping in its scope, and there's no mandate in FLTMA that BLM offer any tract of land available for lease. And no-surface occupancy stipulations certainly fit within FLTMA's statutory mandate as well. With that, I'll reserve my time. Thank you. Thank you. Good morning. May it please the Court. Avi Kupfer for the Federal Appellees. You want to pull the mic up? Yes, sure. Thank you. Avi Kupfer for the Federal Appellees. With me at Council's table is Brett Sumner, who represents the intervener and will be taking two minutes to argue. I'd like to begin by correcting a key mischaracterization of the record in this case. The Price Resource Management Plan is the controlling management document for the management of public lands in central eastern Utah. And the point of that document is to settle a number of broad land use issues. One of the issues that that management document settled is which areas open to leasing would be subject to no-surface occupancy stipulations and which wouldn't. It settled that issue on page 868 of the record and 878 of the record, where the management document said of 1.1 million acres open to leasing, 282,000 would be subject to blanket no-surface occupancy stipulations. But 467,000, including the lands at issue here, would be subject to only minor constraints. And those constraints are incorporated into the leases here. SUA's two proposals for alternatives in this lease sale, Management for Wilderness Characteristics, its deferral alternative, and its no-surface occupancy alternative, squarely conflict with those management directives. And this Court has stated multiple times that when an agency is analyzing alternatives, it's unnecessary to include in that analysis alternatives that are impractical or ineffective to judge it against the agency's objectives. And here those broad objectives are set in the Resource Management Plan. The point of an RNP is so that the agency doesn't at every stage need to re-litigate these broad management issues. Now this would be a different... Well, but you do understand the point that when you get right down to looking at four ecology, whatever is present there, the value, whether for drilling or otherwise, that focus is so much narrower than this broad plan that says, ah, it looks good to us, this looks like there's a potential for use of minerals here. I mean, I think to say that, well, we've looked at it, and to say we're done now, when there is a very different question when you get down to the narrowness of looking at four isolated parcels. Well, so let me take that in parts, Your Honor. Sure. First, I think it's important to place this in context of what NEPA and FLTMA say about how agencies should make these sorts of decisions. NEPA says that an agent, or sorry, FLTMA first says that an agency needs to act in accordance with the management plan. That's the lesson of Norton versus... One of the lessons of Norton versus SUA. And here, the two proposals that SUA proposes are simply outside of the strictures of that management plan. Second, NEPA says that an agency should eliminate repetitive discussions of issues that arise and should tier to broad land management documents, should avoid duplicative analysis. And although here we're talking about four leases instead of a larger area of land, the agency did subsequent on-the-ground field work. And as it explained to SUA, it found no change in the characteristics of these lands from its 2008 and 2010 analysis. Remember, we're not just talking about the price RMP. There was also subsequent analysis that was done in 2010 in the West Habitats EIS, which again went back and looked at a smaller area of land, the West Habitats Plateau, which included these lands, and again analyzed the characteristics of these lands. So two large-scale analyses had already been done. The agency went back and found that the characteristics of these lands had not changed since it conducted those analyses. And this would be a much different case if SUA had come forward with some evidence that some information that the agency had missed when it had conducted those analyses or some claim that in conducting those analyses, you know, the agency missed something or it should have considered another characteristic. But instead, SUA simply states that the agency should consider alternatives that squarely conflict with the management directives in the price RMP, which sets some broad restraints on how the agency is supposed to manage these lands. I think it's also important to point out that these leases contain a number of targeted measures to protect sensitive resources, including various types of wilderness characteristics. They include NSOs to protect ephemeral streams and other streams, also NSOs and time of year restrictions to protect sensitive species and other resources. And if SUA had come forward and provided evidence or suggested some targeted measure to mitigate impacts on sensitive resources, that was within the bounds of the RMP, which again instructs BLM to manage these lands for the development of oil and gas resources. So you're saying that their focus on four parcels would be, and to ask you to focus now on four parcels, would be redundant. You've already done that. You have your plan and you're sticking to it. But now you're saying that they could have come in and target specifics and we would look at them. Does this seem contradictory to you? No, Your Honor. What they can't do is what they did here, which is without any information that the agency's analysis was lacking or any information that the character of these lands have changed, make proposals, blanket NSO stipulations, and management for wilderness characteristics that fall outside the bounds of the RMP. What they could do, but what they didn't do here, is to propose targeted measures to mitigate impacts to sensitive resources. And some of those were incorporated into the leases here. That would fit within the RMP. Into the leases on the four parcels? Correct. There are a number of measures that are discussed in our, that are cited too in our briefing. Again, to protect threatened and endangered species, to protect areas of the landslides and such. Additionally, this isn't their only bite at the apple. The agency needs to conduct additional analysis when the intervener submits its drill permit application, the APD and BLM parlance. They have to do additional NEPA analysis at that point. At that point, SUE is well within its right then to come forward with any new evidence, any new information that the analysis was flawed, that the characteristics of these lands changed in some way. And Judge Briscoe, I'd like to also briefly address, go back to one point you made, which was that the previous environmental analysis considered a larger area. Here we're only talking about four, really nine leases in the environmental assessment. Even though a larger area was considered, SUE hasn't demonstrated at all how the analysis of that area would be any different. You know, it may be a larger area, but what BLM found was that there was nothing when it did on the ground research, when it did subsequent field work in late 2010, early 2011, to suggest that that analysis it had done in 2008 and the follow-up analysis that it did in 2010 for a slightly smaller area of land didn't apply here or was deficient in some way. We're still talking about a large area of land with wilderness characteristics, so that large scale analysis of what the environmental impacts on that land would be equally apply here. And I think that also gets to the point the district court made in footnote four of its The extent SUE is proposing blanket NSO stipulations or preservation or management for the preservation of wilderness characteristics, even putting aside the fact that those suggestions fall outside the bounds of the RNP, they haven't explained how that would be any different than the analysis that was done on the no action alternative regarding environmental impacts. And that was really also the basis of the district court's harmless error finding. The district court said in pages 21 and 22 of its opinion that the agency's analysis of different alternatives here, an action alternative and a no action alternative, bookended the possible universe of management scenarios for these lands. So here, SUA hasn't even challenged the correctness of the finding of no significant impact. So the burden's on them to show that even if there was a NEPA defect, an additional analysis should have been conducted of alternatives. Why that would at all change the FONSI determination when it was based on analysis at either end of that spectrum. That was the basis of the district court's harmless error holding. And as argued in our brief, that's a key issue, an independent basis for the district court's decision that SUA chose not to challenge in this appeal. I realize that this panel, we haven't yet talked about the issue of whether this panel can even grant effectual relief to SUA because it has failed to appeal a dispositive issue. But I think it is worth pointing out that SUA's opening brief claims that this appeal represents. The dispositive issue being what? The district court's holding that there was no harmful error. Correct. Even if this panel were to reverse the district court and find that the NEPA analysis was deficient, the district court's holding on prejudicial error still remains and that's an independent, sufficient basis for its decision that the FONSI should not be remanded and reversed. I couldn't find where that was attacked at all. Was it? The prejudice? It wasn't attacked in the opening brief on appeal. In the reply, SUA characterizes Part 2A of its opening brief as having addressed that. But Part 2A really talks about, all it talks about is the standard, the arbitrary and capricious standard of review. And that goes to the first holding. The second holding of the district court is that even if this argument about whether we're challenging an EA or a FONSI, even putting that aside, you still haven't demonstrated that even if there was a NEPA error, the FONSI should be overturned because you haven't demonstrated that analysis of additional alternatives would change the decision here because, again, the LN analyzed an alternative on one extreme and an alternative on another. And even in that totality of scenarios, it found that impacts wouldn't be significant. If, for example, the panel should look closely at this question of prejudice, is there any need to address all the first points that you and SUA are arguing? There's not, Your Honor. Unless there are further questions from the panel, I'll see the rest of my time to counsel the intervener. Good morning, Your Honors. Brett Sumner on behalf of XTO Energy, the company that purchased the four lease parcels at issue. Just want to provide some additional background and information from the record to respond to some earlier questions. Well, before you do that, let me, I've got one question I'd like to ask you. And that, to your knowledge, are there any geological reasons, reservoirs, conservation, why deferral would not be appropriate in this matter? From a technical standpoint, there were no geological reasons why deferral might be appropriate. I think that was more along the lines with BLM looking at having had these lands open for oil and gas leasing and having looked at various alternatives that would have had the same effect as a deferral and that they decided that they didn't need to do any further analysis to further inform their leasing decision. Okay. Thank you. Regarding geology, though, in terms of directional drilling constraints, BLM explained in the record that the maximum horizontal offset was only 3,000 feet based upon this geology. And this is in the record in the supplemental appendix at page 76 and at page 90. And this goes directly to the fact that the geological layers here are like stacked potato chips as opposed to one long horizontal stream. And because of that, they can only go so far. Still, based upon that, BLM explained in the record that as part of the West Happus EIS analysis, they were looking at doing a standalone alternative for these unleased lands that would have no surface occupancy. But explained that because there were so many other considerations and constraints that they had to look at, as well as the fact that they were imposing mitigation measures to address and minimize these impacts, they decided not to carry it forward. This is explained in the record at supplemental appendix at page 90. And regarding the measures that were actually imposed, I think it's important to note from the operator's perspective that the West Happus Recorded Decision took the analysis of these mitigation measures to minimize impacts to wilderness characteristics. They actually carried these forward to the Record of Decision for that environmental impact statement. And they included for these leases conditions of approval to minimize impacts to wilderness characteristics. And this is in the record at the supplemental appendix, page 196. And they explain what these mitigation measures are. They gated roads and had locked gates to prevent access to some of the roads that went into these wilderness characteristics areas. The operators required to use low profile equipment and facilities. And these various measures are explained in the appendix at 922, 930, and 931. So your leases, are you working those leases at this point? There has been a development proposal that has been submitted. That has been under analysis by BLM for the last several years. A decision has not been issued yet and is still waiting for that decision to be issued. And so whether or not the leases will issue and drilling will occur on these four parcels. And what if any restrictions on those leases will be added is yet to be determined. Is that right? Well, Your Honor, there was a lease notice that said that those conditions of approval would be included in the lease. And that is part of the lease notice for the lease sale. Those conditions of approval relate to any future permit. So those conditions of approval will be added and they have to be complied with in order to proceed. But still you won't ever get to the point where SUA wants you to be, right? Because those restrictions are not sufficient in their view. That's correct, Your Honor. They're not lease stipulations, which would require an amendment to the land use plan. They're conditions of approval that guide future approvals for development. Thank you. Thank you, Your Honors. Counselor, you might want to address the prejudice issue or lack of. Well, Your Honor, if you look at SUA's opening brief. I have. At pages, so with regard to this waiver issue at pages 43, 46 and 50, I believe we squarely tackled this issue from the district court. Furthermore, it's not SUA's obligation, as this court's well aware, in opinions that have been issued. NEPA is a procedural statute. It doesn't govern the substantive outcome. And so, as I mentioned earlier, in cases like Flowers and Davis, this court has squarely analyzed an agency's alternatives analysis and found that alternatives analysis flawed under the rule of reason and found that sufficient to remand. Finding in Flowers, for example, the court talked about how a finding of no significant impact is not the same as no impact. And it acknowledged that there's an obligation that federal agencies have under NEPA to consider alternatives. So we don't have to show that the agency would have had a different outcome at the end of the day. SUA's obligation is to show that BLM violated the rule of reason, which it did here. So you're arguing that prejudice has no place in this, of what the district court found? I think the district court was mistaken when it said that SUA had an obligation to show that the agency erroneously arrived at a finding of no significant impact. Our point here is that the BLM, by violating the rule of reason, failed to comply with NEPA's alternatives mandate. And that alternatives mandate applies at both environmental impact statements and environmental assessments. And that's sufficient for the court to remand. Now, if you look at Instruction Memorandum 2010-117, which is at 673 in the appendix, and so that's a BLM instruction memorandum, and that said that when the agency is walking through the NEPA process in an oil and gas lease sale, that the resource management plans are not the beginning and the end of what the alternatives should be. It specifically called on BLM to consider alternatives, even if those alternatives were not consistent with the land use plan. And that makes sense. The rule of reason analysis looks at if an alternative is consistent with the statutory mandate and not a particular plan. Now, here there's no record one way or the other if SUA's no surface occupancy alternative was consistent with the resource management plan. And finally, I think BLM knows it's too late at the APD stage for us to raise this no surface occupancy issue. If I can just finish that point. Go ahead. The sale of a non no surface occupancy lease is the point the agency makes that commitment of resources. And that's the time at the lease sale stage when it should have considered an alternative such as SUA's reasonable middle ground alternative for no surface occupancy stipulations. Thank you for your time. Thank you all for your arguments this morning. The case is submitted.